Call the first case. 16-1030, Jensen, Corah v. The Bruss Company. Please step up and identify yourselves. Good morning. Chad Muller on behalf of the Appellee. Speak up a little. These are not for us to be taped. Got it. Chad Muller on behalf of the Appellee, The Bruss Company. Frank Andreou, A&D REOU for Plaintiff Appellant. All right. You know the time, 1515 in. Get a little leeway, but don't go, you know. The last one I had, the guy just kept repeating everything for an extra 20 minutes until I pulled the plug. Okay. Understood. All right. Thank you. Good morning, Your Honors. May it please the Court, as I stated earlier, my name is Frank Andreou, and I represent Joe Corah, the Plaintiff Appellant in this case. Before I begin the analysis, I'd like to sort of paint the picture for the panel of what the injured employee of Ad Albio was doing at the time she was injured. And not to make light of the situation, I picture her job equivalent to the I Love Lucy skit where Lucille Ball was trying to keep up with the chocolates on the conveyor belt, and it just kept moving faster and faster and faster, and she couldn't keep up. Only in this situation, we had an employee who was working with a dangerous bandsaw, and instead of small chocolates coming down the line, large hunks of beef were coming down that had to be cut into pieces per the customer specifications within a certain amount of allotted time. In order for this to happen, the defendant had certain safety measures in place, one of which was training. The employee had to be trained specifically to do this job and to handle those cuts, because if they didn't, the production line would have to be stopped, or if the production couldn't be kept up with, it put the employee in danger of injury. Ad Albio was ultimately certified in September of 2011 and decertified on September 29, because she couldn't keep up with her pull. My client had formed two layers of supervision above him. He was a production manager, safety training, had everything that he needed to notice that she wasn't keeping up. When she couldn't keep up with her pull, she would become anxious. She would sweat profusely, her goggles would fog up, and the meat would pile up, and it became dangerous. You have a blade spinning, and she's unable to keep up. Eventually, after the employee was decertified, she was removed from the SAW, and she filed a complaint saying that if she wasn't put back on the job that she wanted, she was going to file a union grievance. Darwin Hanson, my client's supervisor, said, put her back on the SAW and tell her that this is her last chance, and if she doesn't keep up, she'll be pulled off the SAW forever. Why isn't she the whistleblower? I mean, I don't understand why you've got your client who's allegedly blowing a whistle, and she doesn't blow any whistles. She gets her comp benefits. She moves on. Sure. The comp benefits being given are after the fact, and after my client blew the whistle to management that there was a safety violation, and the comp benefits were given reassert to cover up the misconduct, much like, as I stated in my brief, if a bank robber robs a bank but gives the money back, it doesn't mean that he didn't commit the crime. Here, the employee told my client they were trying to interfere with my benefits, and so he didn't want to participate, and he's under an obligation to report accidents and report them accurately. But did she ever assert really in a deposition or in any evidentiary form that the company was denying her benefits? No. She has said that to my client while all this was happening after she was injured. So it's not evidence. Well, it is because it's an effect on the hearer. It's an hearsay exception, Your Honor. My client has an idea of what's happening, and he doesn't want to commit something that would violate a rule of regulation, and there's two that we've alleged. One is accurate reporting of an injury under the Workers' Compensation Act, and the other was the OSHA. You have to maintain them. We can call this report and ultimately place the blame at management's feet, a 5Y, an AR, whatever you want to call it. Well, the fact is it's a memorialization of an accident, and the whole reason it's done is to prevent future injury. But wasn't your client allowed to put down whatever he wanted on that form? He was allowed to put down what he wanted on the Form 300, but the supplemental report was the one they wanted him to change, and two employees at Brock's both stated that that report becomes part of the employee's investigation file. Now, let's talk about that 5Y. It seems to me that I want to go through just a few checking of the facts with you. Sure. The employer instructed your client to fill out certain forms, and we're talking basically the 5Ys, right? And the initial report, yes. He refused. He refused to change it. My client, so what happened was he took, after the employee was hurt, she was taken to a clinic and brought back, had her hand bandaged up. They sat down and they filled out the report as per the mandates. She told him what happened. He wrote it down. There was a team member present, and then he filled out the root cause. Which was that she wasn't properly trained? Which was that she was put back onto the side after she had been decertified. So she was an unsafe employee being put in an unsafe situation. That's your spin on it? Yes. He refused to fill it out the way they wanted him to, okay? Then they instruct some other employee to fill it out in their detailed way to identify the specific causes of why this happened, and that employee filled it out as instructed, correct? He didn't do it the way that the mandates required. He did it the way the employer wanted him to do it, correct? Well, he wanted him to get the answer that they wanted, but he didn't. Did he do it the way the employer instructed him to fill it out? Yes, which was incorrect. It was a violation of the safety mandate. I understand that's your argument. I'm just talking about factually here what happened. Yes, but he didn't do it. I'm sorry. And then after that form was filled out, the claimant, the injured person, not your client, made her claim in-house, not over in the industrial commission, and she was paid. She made a claim in the industrial commission, and it's part of the record. She made a claim, and it was paid, and the employer didn't do anything to thwart her efforts to recover, and she did recover. She recovered, but at the industrial commission,  they did contest. The only issue that my client was trying to prevent them from saying was that the injury did not happen on the job. How did any of this add up to, and I'm quoting, an activity that directly violated and injured employees' rights to benefit under the Workers' Compact? Well, actually, it's the reporting section, Your Honor, that we've cited also. The Illinois Workers' Compensation Act has a specific provision on accurate reporting, which is made part of the claim. If you put in information that is inaccurate, that necessarily means that he's filing a false report. It's no different than the Young v. Alden Gardens case because what you're putting into the file is something that didn't happen, and it's either going to be OSHA looking at it. It could be anybody looking at it. Well, what didn't happen here is that she wasn't denied her benefits. She got her benefits. She got her benefits. And your client strikes me as an opportunist who doesn't want to do his job the way his employer suggests and then wants to try to take advantage of it and claim to be a whistleblower. Well, reason might be different. That's a jury question as to whether or not he's an opportunist because that takes us to the second part of the analysis under the Whistleblower Act as to whether or not the actions taken by the employer were reasonable. Was he a subordinate, an opportunist like the court has stated, or was he a whistleblower? Was he filing retaliation? I'd like to start with the question of law before we get to the question of act. And so let's just talk about the first element under the act. So as I understand from the brief, the company was self-insured. So did they pay him to the workers' comp fund? I don't know the answer to that. Well, would they be self-insured in paying into the workers' comp fund? I believe they're self-insured up to a certain point. And if the injury is as typical with larger companies, if they're self-insured, it's up to a certain point, and then after that, if there's insurance, that makes sense. But in any case, there was some determination with respect to the extent of Ms. Albia's injuries. Yes, and that was done in-house. Right, such that the claim was covered by Bruss, is it? Bruss & Company or Bruss Incorporated? Yes. And she was compensated for her injury therefore. That's correct. So would there have been any misstatement that would have gone to the Illinois Workers' Comp Commission? Really? If there was an investigation, so this kind of takes it back to the factual part of it, Your Honor, and I think that has to be just a little bit before I can answer the legal question. If Joe's whistleblowing, Mr. Corr's whistleblowing had thwarted their attempts to suppress or interfere with her benefits, then they don't get the benefit of saying that there was nothing that they can be sued for under the Whistleblower Act just because the end result was favorable to the claimant. The fact of the matter is that there were records that they wanted to retain in her file that were incorrect, and he did not want to participate in the violation of that portion of the act. So whether or not she ultimately received her benefits because the employee blew the whistle, so to speak, and stopped them from doing so doesn't alleviate the fact that he was terminated before the claim was completely processed. Doesn't this whole appeal, though, go to the point that you still have a retaliatory discharge claim pending? And if we don't reverse or if this trial court standing stands, you've got really no merits on your retaliatory discharge claim. I don't understand the question, Your Honor, because the – They're separate and distinct. Yes. It would help your case if we reversed the outcome of the case at the trial level. Yes, it would. But I still have a common law claim of retaliation for other reasons. This one specifically deals with a statutory violation, and in order to prevail under it, I have to at least at the trial court level assert a rule, regulation, or law that would have been violated. And the only one I have asserted so far, too, is one, show reporting, and number two, report on the Workers' Comp Act. And then we go to the factual analysis as to whether or not he was terminated. So the threshold issue that the trial court had to determine was whether or not there was a rule, regulation, that was cited as a matter of law that would have been violated had the action been taken. And we're asserting that it would have been. It would have been filing a false report as to the cause of the accident, i.e., an unqualified employee being put on a dangerous cutting tool. That's what my client was trying to say. So whether or not the meat jumped or the glove got caught, that's the means to the end. Why was the employee there in the first place? Well, why do we have the five whys? I mean, it seems to me that your argument as to, you know, the direction of the employer that should be put back on the line doesn't really go to answering the root cause issue. What is your understanding of root cause? I mean, I understand that there were decisions made all along the way as to whether or not Ms. Alvea could be properly placed on the line. But really, that was a management decision. Why, in fact, did the glove get caught in the saw such that her finger was injured? Because she couldn't keep up with her pull, and she got her finger too close to the blade. And she couldn't keep up with her pull because she wasn't qualified to be there in the first place. So what's the root cause argument that just goes on and on and on and on and on? I don't know, Your Honor, because ultimately we have to determine whether or not the employee was qualified in the first place. I can read a manual on how to fly a plane, but if I get behind the cockpit, somebody's going to tell me you can't fly that plane because you're not qualified. And if the plane crashes, I can say, well, it crashed because it hit the building and lost air. But the real reason is because I shouldn't have been a pilot in the first place. And that's the situation we have here. Do you have any cases that you can cite to us where it's a whistleblower who's claiming that he or she is entitled to damages for something that happened to somebody else when that person didn't make any kind of claim? Young versus Alden Gardens, they were falsifying the patient's records. The patient had the claim, never made the claim. And the plaintiff in that case got the benefit of the Illinois Whistleblower Act because she refused to falsify a document. And the appellate court in that case said you don't need to know. They found the law. The appellate court found the law and said it's also common sense. You don't falsify documents. So the Young case is directly on point. The patient was the one that had her records falsified. The patient was the one that had her glucose levels misstated. The nurse was literally filling in the blanks, possibly could have caused harm. It never happened, much like here. She got her benefits. So what's the big deal? The big deal is they blew the whistle. They stopped the misconduct from happening. She refused to chart incorrectly. My guy refused to do it. But they also cited directly to a statute under the Nurse Practice Act. Yes. I don't see how that is comparable to the situation that you're pleading here. Sure. I cite to the Illinois Workers' Compensation Act that requires accurate reporting of injuries. I cite to the civil and criminal penalties under the act for misstating. She filed her claim. She was paid. I don't see what got thwarted here other than your client's insistence on not filling out a form the way his employer wanted him to. I would argue to the court, Your Honor, it doesn't make a difference whether or not he got her benefits. The fact of the matter was he refused to participate in illegal conduct, and that's where the analysis lies. Again, in the Young case, the patient's chart wasn't tampered with. There was no harm. Young didn't tamper with the chart at all, but she ended up getting constructively discharged in that case because of her refusal to falsify those records. Here under the OSHA provisions, we have civil and criminal penalties for making any false statement in a federal jurisdiction issue, especially when you're trying to thwart any investigation. OSHA has the right to come out and inspect records, and you can call it whatever you want. The fact of the matter is the accident investigation report and the five whys are a memorialization of what happened, and here you have the worst kind of violation, management violating safety mandates that directly resulted in an employee getting injured. So the workers' compensation benefits ultimately being received isn't where I would direct the court's attention. The only reason she got those benefits is because Russ said, well, now we have a whistleblower. Now we're going to have to give her her benefits. Go ahead and do it. Otherwise, we have a statement made by the employee saying, they told me I wasn't entitled to my benefits. Your Honor's concern is, well, that's not evidence. That's rank hearsay. It's an exception to the hearsay rule. It's the effect on the hearer, which is a recognized exception, so that Joe Clore can make the assessment of whether or not there was going to be a legal issue if he did participate in the misconduct. It goes into his overall view of the lay of the land. And if it really mattered, or if it doesn't matter what's in the five whys, why would they ask him to rewrite it in the first place? It really doesn't matter. She ended up getting the benefits anyway, so who cares what's in the report? Well, it's your position that the five whys goes to whether or not she gets benefits. As I understand, their interest in the five whys is to prevent a future injury. Right, and let me be clear on that. I'm not asserting that the five whys have anything to do with the benefits, but it shows a cause of how somebody was injured that would be made part of a file either with her injury claim or with OSHA. It wouldn't thwart her benefits in any way whatsoever because all you have to show in comm is that the work-related injury was work-related. That's it. However, when somebody comes in to investigate an injury, they're going to want to see reports. I understand the meat jumped or the glove got caught. Well, how did that happen? Tell me about the employee. Well, the employee wasn't qualified. Oh, really? Why not? Well, because she couldn't keep up with her pull. Whose decision was it to put her back on the line? Well, it was management's decision. That strikes me as something that would be properly handled by the cause versus condition argument. I mean, you're saying that it's the fact that she was put back into the position that caused the injury when, in fact, it was the way she was operating it that caused the injury. Yours strikes me as a condition rather than the cause being that the glove got caught. Understood. But once we start making those assessments, Your Honor, you're in the jury's territory. That's a question of law on causation. That's a question of law. Okay. But the fact remains that putting in a false narrative as to how the accident happened or why is what we were refusing to do. The injury, where she was placed, how it happened is another analysis. Did the employee in any evidentiary form support your argument here that this was done falsely? I'm sorry. What was done falsely? The whole refusal to put in what your client wanted to put in. No. But the two people that do support it are Ochoa and Darwin Hanson themselves because they're documented in their own depositions. They say, yes, she wasn't qualified. We pulled her off the slot. But then we put her back on to avoid a union issue. And they were the ones who admitted in their under oath and their depositions that they told Cora to redo the investigation and remove any reference to management issues. This goes to the heart of the matter, Your Honors. You can't have management come back and say, violate our own safety mandates by taking out evidence from a report that we require you to fill out that could potentially violate a state and federal statute and that have no consequences under the old Melissa Blower Act. I would assert to the court that is exactly why the statute was enacted in the first place because ultimately we're talking about safety, but we're talking about it with a forked tongue. On the one hand, we pay lip service to safety. And on the other hand, we put an unqualified worker on a cutting tool to avoid union grievance. There's so many problems with that defense to this claim, Your Honor, that it should not be allowed to go forward that way. This case should have gone to a jury. And the only threshold issue that we need to deal with today is whether I properly allege and have factual evidence to show that there would have been a violation of a state or federal law had he filed a false report and we're certain that he did. And so then the jury can be instructed, was his belief reasonable? Do a special interrogatory, a 60.01 instruction to say violation of a statute. Would he have been violating it? And the jury says, come on. And much to your point, Justice Levin, this guy's opportunist. Give him nothing. But the issue has to be heard by the jury. What happened in the trial court was a trial on paper. And that is exactly what summary judgment isn't. I understand it's to alleviate certain issues that go to a jury. But in this case, this case was tried by Judge Schneider on paper. And he specifically said you cannot prove a violation of the statute. He didn't say you didn't plead it. He said you didn't show any evidence to show that there would have been a violation other than to generally state that the Oil and Workers' Compensation Act would have been violated. That's not true. There's specific reporting requirements in all the statutes that I cited. That was what I needed to plead. The jury needed to do the rest. So that's the reason why this case should go back. Are you done? I think so, unless there's any other questions. I'm good. Okay. And you know how much time I have left for any rebuttal, if necessary. You've got four or five minutes. Thank you very much. Good morning again. My name is Chad Moeller. I represent the Apple Leaf Bruss Company. Your Honors, as a threshold matter, the company did not ask Mr. Cora to engage in any illegal activity. It did not ask him to falsify any report. It did not ask him to falsify the five whys. It needed to know, pursuant to its safety regulations and guidelines, why Ms. Albia's finger made contact with the saw blade. Mr. Cora stubbornly put in his five whys that the root cause was the company's decision to put Ms. Albia back on the saw after they took her off for a few days after she was suffering from apparent health issues. Mr. Cora was told repeatedly by no fewer than three management employees that his five whys did not adequately inform the company why Ms. Albia's finger made contact with the saw blade. Is that exactly how it's phrased, why Ms. Albia's finger made contact? Is that the phraseology? Your Honor, that is what Mr. Cora was instructed during the October 8th meeting in terms of what the company wanted to know. They wanted to know whether there were any preventative measures that the company could have taken to prevent a similar accident from happening in the future. Now, we know that Ian Byron, another production supervisor, who was a production supervisor who drove Ms. Albia to the clinic after she was injured, satisfactorily completed the five whys for her. He concluded that the root cause of her injury was the fact that when she got towards the end of the short loin where the bone of the meat rests, the bone made contact with the blade. It jumped or jerked. Ms. Albia failed to let go of the piece of meat, which pulled her finger into the saw blade. One of the timing sequences that counsel alleges is to the alleged, what you're saying happened in his saying that the party who was injured claims that they made assertions before, and then you guys went back and changed things to allow the work to happen. Your Honor, there is absolutely no evidence in the record that Ms. Albia was ever told that she would not be eligible for workers' compensation rights or benefits, and there's no evidence in the record that she ever claimed that she was told that the company said. What about his suggestion that there's documents over in the Industrial Commission forms indicating that there was some resistance on the part of Russ? Justice Aladdin, those were nothing but administrative documents that are routinely filed with the Workers' Compensation Commission in these types of situations. As the record reflects, Tyson Foods, which owns Russ Company, is a self-administered workers' compensation organization. They self-fund their own claims. They are large enough where they are permitted to opt out of the state-mandated funding requirements, and that's exactly what they did here. Ms. Albia filed a claim. The claim was processed. Sure, there was a corresponding administrative process initiated with the Workers' Compensation Commission, but there was never any dispute that Ms. Albia was injured on the company's premises or that she was eligible for benefits. Her claim was administered and processed. All her benefits were paid, including all of her medical benefits. Under Section 20 of the Illinois Whistleblower Act, the plaintiff must prove that he refused to participate in an activity that would have violated a federal or state law, rule, or regulation, and he has failed to do so. In his second amended complaint, specifically at paragraph 67, he claims that he was forced to, quote, participate in the company's efforts to show that Ms. Albia's injury did not occur while she was working, end quote. That simply didn't happen. He was never asked to reflect in his five-whys form that Ms. Albia wasn't hurt on the company's premises. He admitted that in his deposition. I asked Mr. Cora point-blank, did anyone at the bus company instruct you to reflect in your five-whys or anywhere else in your AIR that Ms. Albia was not injured on the company's premises? And he answered in the negative. This was never about Ms. Albia's workers' compensation rights or claims. This was about Mr. Cora wanting to prove to the company that his objection to the company putting Ms. Albia back on the saw was correct. During the October 8, 2011 meeting, which ultimately led to Mr. Cora's termination, he didn't once raise workers' compensation issues with the management team. He didn't once say, I'm refusing to change the five-whys because I believe you're interfering with Ms. Albia's workers' compensation rights. In his opening brief, Mr. Cora cites the three provisions of the Illinois Workers' Compensation Act that he claims would have been violated had he completed the five-whys. The first one is Section 305-4H, which generally prohibits an employer from interfering with someone's workers' compensation rights. The record is crystal clear. The company did absolutely nothing to interfere with Ms. Albia's workers' compensation rights. Ms. Albia never claimed that the company interfered with her workers' compensation rights. And if you look at Mr. Viro's five-whys, he's the gentleman who actually completed the five-whys, and you take that as an example of a satisfactory five-whys form, the result of that five-whys form is that Ms. Albia still received her workers' compensation benefits. So had Mr. Cora actually satisfactorily completed the five-whys, like Mr. Viro, Ms. Albia still would have received her workers' compensation benefits. The next section of the Illinois Workers' Compensation Act that Mr. Cora cites is Section 305-6B, which requires employers to file certain reports with the Workers' Compensation Commission if an injury results in a loss of more than three scheduled work days. Here we know that Ms. Albia didn't miss a single day of work. She went to the clinic to receive treatment, came back later that afternoon, and went to work the next day. There was no missed work at all. So that section isn't implicated in this situation. And the final section of the Workers' Compensation Act that Mr. Cora cites is Section 305-25.5, which are merely the penalties associated with an underlying violation of the Act. Your Honors, in our brief, we cited three primary cases directly on point, that being the Lucas case, the Sardegna case, and the Ulm case. All those cases involve situations where the court affirmed summary judgment in the employer's favor because the plaintiff failed to identify specifically any state or federal law or regulation that would have been violated had the plaintiff engaged in the activity in which he refused to engage. This case is nothing like Young v. Alban guidance, which the plaintiff relies on in his opening brief. In Young, the plaintiff, a nurse, refused to falsify patients' glucose reports. There was no dispute in the end that that activity would have violated actual provisions of the Illinois Nurses Act as well as a provision of the Illinois Administrative Code. In fact, the defendant's own management employee in that case acknowledged at trial that that conduct violated state law. Here, we have no potential or actual violation of state law or federal law. Had Mr. Cora completed the five rise forms as instructed and in accordance with the company's guidelines, Ms. Alvius still would have received her benefits just as she received in the wake of Mr. Biles. What do you think of counsel's argument, Mr. Andrews' argument, that it's not important or it's of no moment whether or not she would actually or actually receive her benefits? The point of the matter is that he was being required to participate in conduct that was violative of the act. Your Honor, I couldn't disagree more with that contention because it does matter whether Ms. Alvius ultimately received her benefits. Because she received her benefits in the wake of Mr. Biles' completed five rise form, it confirms that he did not engage in any or refuse to engage in any activity that would have violated any provision of the law. If Mr. Cora was asked to perpetuate the company's campaign to fight Ms. Alvius' application for workers' compensation benefits and they actually denied her benefits based on a doctored report, that would be a different case. But that's not what happened here. The meeting on October 8th, 2011, which led to Mr. Cora's termination, had nothing to do with workers' compensation. So your position is as long as the story ends well, it doesn't matter what happened in the middle to get to the end? Your Honor, the ending is important, but every step in between is important as well. And there's nothing that happened from beginning to end that would support Mr. Cora's contention that the company ever asked him to assist with the interference of Ms. Alvius' workers' compensation rights. The very premise of his claim that the company sought to interfere with Ms. Alvius' workers' compensation rights is false. And because it's false, his whole case goes away. Because he can't satisfy the first element of a claim under Section 20 of the Whistleblower Act. And that point is reinforced by the Court's holdings in Lucas and Sardiga and Hall, where the plaintiffs were similarly unable to identify any state or federal rule, law, or regulation that would have been violated had the plaintiffs engaged in the activity that they were requested to engage in. Your Honor, second, the plaintiff is unable to establish causation in this case. As we know, the Michael v. Precision Alliance case made it very clear that when an employee articulates the reason for an employee's termination in this type of case, that the plaintiff must show that the employer's reason was a pretext for retaliation. Here we know that Mr. Ochoa, the plant manager of the Bras facility who made the decision to terminate Mr. Cora, had no knowledge of Ms. Alvius' workers' compensation proceedings. Again, the issue of workers' comp didn't come up during the meeting that led to the termination. He could not have been motivated by the so-called interference with Ms. Alvius' workers' compensation rights in making the termination decision. So Mr. Cora's claim fails for the lack of the ability to satisfy either element of his Section 20 claim. In his opening brief, the plaintiff also challenges two interlocutory orders by the Circuit Court, the first being an order dated September 10, 2014, and the second being an interlocutory order dated December 18, 2014, neither of which was mentioned in the plaintiff's notice of appeal. For that reason and for the reasons articulated in our opening brief, it's our position that this Court lacks the jurisdiction to consider the plaintiff's appeal of those two interlocutory orders. Thank you, Your Honor. Thank you. Understanding that my time is limited, I do want to point out that there are two issues. One was interference with the benefits and the other was filing a false report, and counsel has only addressed the one. Our emphasis should be on the filing of the false report. Now, Ochoa, in his own deposition, admitted that he had told Mr. Cora to redo the 5-Y. So it had nothing to do with comp and everything to do with falsifying a report. So we have to keep that into perspective. It would surprise me if someone from the defense came and admitted that they tried to do anything other than follow their own rules. That is why we have juries. And, again, most of Mr. Moeller's arguments focused on fact questions. At the threshold, we've asserted statutes that would have been violated. Now, as far as the interlocutory nature of the order, I've responded to that in my response. There is no prejudice because the notice of appeal is broad enough. It's the denial of the count. The trial court had denied it in a piecemeal manner, and there's no prejudice because they were able and did answer even those orders. They addressed them in their brief, and the record on appeal does contain those orders in it. But, again, the court should focus on the report itself. It is a memorialization of what happened and management engaged in an effort to thwart the truth. And that's the reason why the case should be sent back. Can you address the emotional distress claim? How was that fled? In the complaint, we basically say all allowable damages, including emotional distress. The issue that was brought up in the lower court was if you read the statute in black and white, it just says compensable damages. It doesn't say anything about emotional distress or punitives. From the time I filed this case until the time it was ultimately ruled out in summary judgment, the Young case came out at which the court considered whether or not emotional distress damages in that case were excessive. I would imagine if the appellate court saw that it wasn't an area of relief, they would have denied the claim outright and said you weren't entitled to those damages, so they're excessive because you should have gotten none, and the trial court didn't award them in the first place. They're compensable damages. They should be allowed. And I think the Young case supports, although indirectly, those damages as an element. Are you done? I am done. All right, thank you. Thank you. We'll take any advisements. Your briefs were very well done, and your arguments were very interesting and entertaining. You both hit on all the bells and whistles, so maybe you leave us with the three of us can argue now. Thank you. Hold on.